**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-03187-NYW-CYC

GARRISON PROPERTY AND CASUALTY INSURANCE COMPANY, and
USAA CASUALTY INSURANCE COMPANY,

      Plaintiffs/Counterclaim Defendants,

v.

NICHOLAS S. HORTON, and
TAISHARA ABEYTA,

      Defendants/Counterclaim Plaintiffs.

---

### MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Defendant & Counterclaimant Nicholas Horton's Motion for Partial Summary Judgment ("Horton Motion for Partial Summary Judgment"), [Doc. 131], and Plaintiffs/Counterclaim Defendants' Motion for Summary Judgment ("Plaintiffs' Motion for Summary Judgment"), [Doc. 161]. The Court has reviewed the Motions and concludes that oral argument would not materially assist in their resolution. For the reasons herein, Plaintiffs' Motion for Summary Judgment is respectfully **GRANTED** and the Horton Motion for Partial Summary Judgment is respectfully **DENIED**.

### BACKGROUND

In 2018, Nicholas Horton ("Mr. Horton") was operating a motorcycle with Taishara Abeyta ("Ms. Abeyta," and with Mr. Horton, "Defendants") as his passenger. [Doc. 29 at ¶ 9]. Defendants were involved in a collision and both were injured as a result. [*Id.*]. Ms. Abeyta subsequently sued Mr. Horton for negligence in state court. [*Id.* at ¶ 12].

The motorcycle was owned by Mr. Horton's father, Daniel Horton,[1] and was insured through Progressive Casualty Insurance Company ("Progressive"). [*Id.* at ¶¶ 3, 9, 13]. In addition, during the relevant time period, Nicholas Horton held automobile insurance through Plaintiff Garrison Property and Casualty Insurance Company ("Garrison"), and Daniel Horton held automobile insurance through USAA Casualty Insurance Company ("USAA," and with Garrison, "Plaintiffs" or the "Insurers"). [*Id.* at ¶¶ 7–8]. Both Progressive and Garrison provided Mr. Horton a defense in Ms. Abeyta's state-court case, though Garrison did so under a reservation of rights. [*Id.* at ¶¶ 13–14]. The state case went to trial and resulted in a $42 million verdict in Ms. Abeyta's favor, with the jury finding Mr. Horton responsible for 5% of her damages. [*Id.* at ¶ 15]. Judgment was entered against Mr. Horton for just over $3 million. [*Id.* at ¶ 16].

On December 9, 2022, Garrison filed this declaratory judgment action. *See generally* [Doc. 1]. Garrison later filed an Amended Complaint, which added USAA as a Plaintiff. *See* [Doc. 29]. The Insurers seek a declaratory judgment that Daniel Horton's motorcycle was not covered under their Policies. [*Id.* at ¶ 22]. Mr. Horton asserted counterclaims against Plaintiffs for (1) breach of contract; (2) "willful and wanton breach of insurance contract"; and (3) unreasonable delay or denial under Colo. Rev. Stat. § 10-3-1115 and -1116. [Doc. 63 at ¶¶ 32–50]. Mr. Horton assigned his common law bad faith claim to Ms. Abeyta, *see* [Doc. 60 at ¶ 3], and Ms. Abeyta asserts that bad faith counterclaim against the Insurers, as well, *see* [Doc. 62 at 22–23 ¶¶ 46–52].

---

[1] When necessary for clarity's sake, the Court refers to Nicholas and Daniel Horton using their first names.

On August 12, 2024, Mr. Horton moved for partial summary judgment in his favor, asking the Court to find (1) "coverage in his favor," and (2) that the Insurers "can't claim the benefit of any provision to avoid coverage, since they breached the policies first, and/or since they are waived or estopped from asserting no coverage."  [Doc. 131 at 21].[2] The Insurers subsequently moved for summary judgment in their favor on their declaratory judgment claim and all of Defendants' counterclaims, arguing that no coverage exists under the relevant Policies and, as a result, Defendants cannot prevail on their counterclaims.  [Doc. 161 at 2].

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (cleaned up).

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard," *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019), and "the denial of one does not require the grant of another," *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). However, the burden at summary judgment slightly differs depending on which party bears the ultimate burden at trial.  A movant that does not bear the ultimate burden of

---

[2] Ms. Abeyta filed a "Joinder in Defendant and Counterclaimant Nicholas Horton's Motion for Partial Summary Judgment," wherein she "incorporates said Motion including all attachments and exhibits by reference."  [Doc. 132 at 1].

persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once this movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). But "if the moving party has the burden of proof [at trial], a more stringent summary judgment standard applies." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). A moving party who bears the burden at trial "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id.* When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views the record in the light most favorable to the nonmoving party. *Banner Bank*, 916 F.3d at 1326.

## UNDISPUTED MATERIAL FACTS

These material facts are drawn from the summary judgment record and are undisputed unless otherwise noted.[3]

---

[3] On two occasions, this Court struck Ms. Abeyta's Response to Plaintiffs' Motion for Summary Judgment for failure to comply with the undersigned's Civil Practice Standards and Rule 56. *See* [Doc. 174; Doc. 186]. The Court specifically called out, inter alia, Ms. Abeyta's improper attempt to incorporate into her Response "all her prior pleadings as well as the pleadings of her co-defendant relating to these same issues, including Horton's Response to the Insurers' MSJ," [Doc. 174], as well as her failure to comply with the requirement to set out additional statements of disputed fact in numbered paragraphs with supporting citations to the record, [Doc. 186]. The Court warned Ms. Abeyta that "[a]dditional non-compliance with the Court's Practice Standards or the Federal Rules may result in the Court considering a fact undisputed for purposes of the Motion." [*Id.*]. Despite the Court's admonitions, Ms. Abeyta's Response commits the same violations

***The Collision:***

1.      On March 13, 2018, while Nathan Horton was operating a motorcycle and Ms. Abeyta was his passenger, the two were involved in a collision.  [Doc. 131 at ¶ 3; Doc. 135 at 2 ¶ 3; Doc. 29 at ¶ 9].

2.       The motorcycle was owned by Nathan Horton's father, Daniel Horton, and was insured through Progressive.  [Doc. 131 at ¶¶ 4–5; Doc. 135 at 2 ¶¶ 4–5; Doc. 29 at ¶¶ 9, 13].

***The Insurance Policies:***

3.      At the time of the collision, Nicholas Horton held an automobile insurance policy through Garrison that insured his pickup truck, and Daniel Horton held an automobile insurance policy that insured four automobiles (together, the "Policies").  [Doc. 161 at ¶ 1; Doc. 172 at 2 ¶ 1; Doc. 189 at ¶ 1]; *see generally* [Doc. 64-1 (the "Garrison Policy"); Doc. 64-2 (the "USAA Policy")].

4.      The Policies each contain the following three exclusions, which the Court refers to as "Exclusion B.1," "Exclusion B.2," and "Exclusion B.3," respectively:

> B. **We** do not provide Liability Coverage for the ownership, maintenance, or use of:
>
> 1. Any vehicle that is not **your covered auto** unless that vehicle is:
>
>    a. A four- or six-wheel land motor vehicle designed for use on public roads;
>
>    b. A moving van for personal use;

---

previously highlighted by the Court, as she (1) does not set forth her additional disputed facts in numbered paragraph form or provide citations to the record; and (2) still attempts to "incorporate[] the factual summations and opinions of" her experts and Mr. Horton's additional statement of facts.  *See, e.g.*, [Doc. 189 at 12].  These procedurally improper arguments are insufficient to establish a dispute of material fact and the Court does not consider them.  *See* Fed. R. Civ. P. 56(c)(1)(A), (e)(2).

    c.  A **miscellaneous vehicle**; or

    d.  A vehicle used in the business of farming or ranching.

2.  Any vehicle, other than **your covered auto**, that is owned by **you**, or furnished or available for **your** regular use.  This exclusion (B.2) does not apply to a vehicle not owned by **you** if the vehicle's owner has valid and collectible primary liability insurance or self-insurance in force at the time of the accident.

3.  Any vehicle, other than **your covered auto**, that is owned by or furnished or available for the regular use of, any **family member**. This exclusion (B.3) does not apply:

    a.  To your maintenance or use of such vehicle; or

    b.  To a vehicle not owned by any **family member** if the vehicle's owner has valid and collectible primary liability insurance or self-insurance in force at the time of the accident.

[Doc. 161 at ¶ 6; Doc. 172 at 2 ¶ 6; Doc. 189 at ¶ 6; Doc. 64-1 at 26, Doc. 64-2 at 19].

    5.     The Policies define "your covered auto" to mean "[a]ny vehicle shown on the Declarations" or "[a]ny newly acquired vehicle."  [Doc. 161 at ¶ 7; Doc. 172 at 2 ¶ 7; Doc. 189 at ¶ 7; Doc. 64-1 at 23; Doc. 64-2 at 16].

    6.     "Newly acquired vehicle" is defined in the Policies as follows:

1.  "**Newly acquired vehicle**" means a vehicle, not insured under another policy, that is acquired by **you** or any **family member** during the policy period and is:

    a.  A private passenger auto, pickup, **trailer, or van;**

    b.  A **miscellaneous vehicle** that is not used in any business or occupation; or

    c.  A **motorcycle,** but only if a motorcycle is shown on the current Declarations.

[Doc. 161 at ¶ 7; Doc. 172 at 2 ¶ 7; Doc. 189 at ¶ 7; Doc. 64-1 at 23; Doc. 64-2 at 16].

7.      A "miscellaneous vehicle" means a "motor home; golf car; snowmobile; all-terrain vehicle; or dune buggy."  [Doc. 161 at ¶ 8; Doc. 172 at 3 ¶ 8; Doc. 189 at ¶ 8; Doc. 64-1 at 22; Doc. 64-2 at 15].

8.      A "motorcycle" is defined as "a two or three-wheeled motor vehicle that is subject to motor vehicle licensing in the location where the motorcycle is principally garaged."  [Doc. 161 at ¶ 9; Doc. 172 at 3 ¶ 9; Doc. 189 at ¶ 9; Doc. 64-1 at 23; Doc. 64-2 at 16].

9.      Daniel Horton's motorcycle was not listed as "Your Covered Auto" on either of the Policies.  [Doc. 161 at ¶ 4; Doc. 172 at 2 ¶ 4; Doc. 189 at ¶ 4; Doc. 64-1 at 6, 23; Doc. 64-2 at 4, 16].

***The Parties' Dealings and the State-Court Litigation:***

10.      In July 2019, Ms. Abeyta sued BAS Rentals Inc., a traffic control company, alleging that BAS Rentals negligently caused the collision.  [Doc. 161 at ¶ 23; Doc. 172 at 4 ¶ 23; Doc. 189 at ¶ 23]; *see generally* [Doc. 64-3].

11.      On October 28, 2019, Ms. Abeyta's lawyer sent Plaintiffs a letter stating that Ms. Abeyta was "offering to release your insured from any claims from this collision in exchange for payment of th[e] liability limits."  [Doc. 131 at ¶ 8; Doc. 135 at 4 ¶ 8; Doc. 135-2 at 2].

12.      On October 31, 2019, Plaintiffs responded to the letter stating that "the USAA policy would not afford coverage to" Ms. Abeyta, specifically mentioning Exclusion B.2.  [Doc. 161 at ¶ 22; Doc. 172 at 3–4 ¶ 22; Doc. 189 at ¶ 22; Doc. 161-5 at 2–3].[4]

---

[4] The Parties dispute whether this denial of coverage was based exclusively on Exclusion B.2, but do not dispute the contents of the letter.  [Doc. 161 at ¶ 22; Doc. 172 at 3–4 ¶ 22; Doc. 189 at ¶ 22].

13.     On June 17, 2020, Ms. Abeyta offered to settle with USAA for $100,000. [Doc. 131 at ¶ 14; Doc. 135 at ¶ 14; Doc. 131-6 at 1–4].

14.     USAA rejected the offer and reiterated that the USAA Policy did not afford coverage.  [Doc. 131 at ¶ 15; Doc. 135 at 4 ¶ 15; Doc. 131-7 at 1].

15.     In November 2020, after settling with BAS Rentals, Ms. Abeyta amended her complaint to add a negligence claim against Mr. Horton.  [Doc. 161 at ¶¶ 26, 31; Doc. 172 at 4–5 ¶¶ 26, 31; Doc. 189 at ¶¶ 26, 31; Doc. 64-8 at 1; Doc. 64-4 at 1].

16.     Mr. Horton was served with Ms. Abeyta's amended complaint on February 18, 2021.  [Doc. 161 at ¶ 32; Doc. 172 at 5 ¶ 32; Doc. 189 at ¶ 32; Doc. 64-9 at 1].

17.     In March 2021, Progressive requested that Garrison participate in the defense of the state-court case, and that same month, Garrison sent a letter to Mr. Horton stating that "if we believe it's in your best interest to settle the claim, we'll attempt to reach a settlement within your policy limits."[5]  [Doc. 161 at ¶¶ 34–35; Doc. 172 at 5 ¶¶ 34–35; Doc. 189 at ¶¶ 34–35; Doc. 131-9 at 1; Doc. 161-8 at 1].

18.     That same month, Garrison submitted a $100,000 settlement offer to Ms. Abeyta.  [Doc. 131 at ¶ 22; Doc. 135 at 5 ¶ 22; Doc. 131-10 at 1].

19.     Ms. Abeyta rejected Garrison's offer.  [Doc. 131 at ¶ 25; Doc. 135 at 5 ¶ 25; Doc. 131-11 at 1–2].

20.     In August 2021, Garrison hired the law firm of Wheeler Trigg O'Donnell to defend Mr. Horton against Ms. Abeyta's case.  [Doc. 161 at ¶ 40; Doc. 172 at 7 ¶ 40; Doc. 189 at ¶ 40; Doc. 63 at ¶ 21].

---

[5] The Parties dispute the characterization of Garrison's letter, but not the contents.  *See* [Doc. 131 at ¶ 21; Doc. 135 at 5 ¶ 21; Doc. 161 at ¶ 35; Doc. 172 at 6 ¶ 35].

21.    On October 4, 2021, Garrison sent a letter to Mr. Horton stating that Garrison "reserve[s] the right the right to deny coverage under the policy as to Ms. Abeyta's claim against you for reasons including that no coverage is provided under the policy for the ownership, maintenance, or use of the 2003 Harley Davidson motorcycle you were operating at the time of the accident," specifically mentioning Exclusion B.1 (the "October 2021 Letter").  [Doc. 161 at ¶ 41; Doc. 172 at 7 ¶ 41; Doc. 189 at ¶ 41; Doc. 64-12 at 3–4].

22.    When Mr. Horton was asked if he would have done anything differently had he received the October 2021 Letter earlier, he answered "I don't know," and stated that it would be "fair" to say that he would have not done "anything different because of th[e] letter."  [Doc. 161 at ¶ 43; Doc. 172 at 7 ¶ 43; Doc. 189 at ¶ 43;[6] Doc. 135-1 at 128:8–129:2].

23.    In May 2022, Mr. Horton and Ms. Abeyta participated in mediation.  [Doc. 161 at ¶ 44; Doc. 172 at 7 ¶ 44; Doc. 189 at ¶ 44; Doc. 63 at ¶ 23].

24.    In July 2022, a jury determined that Mr. Horton was 5% at fault for the collision and entered judgment against him in the amount of $3,014,602.59, plus post-judgment interest.  [Doc. 161 at ¶ 45; Doc. 172 at 8 ¶ 45; Doc. 189 at ¶ 45; Doc. 63 at ¶¶ 25–26; Doc. 64-6 at 3; Doc. 64-7 at 1].

---

[6] Plaintiffs assert that Mr. Horton "did not identify anything he would have done differently had he received the reservation-of-rights letter earlier."  [Doc. 161 at ¶ 43].  Mr. Horton admits that this was his testimony, but denies Plaintiffs' assertion for reasons "explained in" Paragraphs 29 and 30 of his Response to Insurers' Statement of Facts.  [Doc. 172 at 7 ¶ 43].  The Court has reviewed those Paragraphs and finds that they do not contain anything directly responsive to Plaintiffs' assertion.  *See* [*id.* at 5 ¶¶ 29–30].

**This Litigation:**

25.    Mr. Horton assigned his common law bad faith claim to Ms. Abeyta.  [Doc. 161 at ¶ 13; Doc. 177 at ¶ 13; Doc. 189 at ¶ 13; Doc. 161-2 at 3 ¶ 17].

26.    With respect to her bad faith counterclaim, Ms. Abeyta claims as damages "the Excess on her assigned claim," which consists of "the full amount of the principal and cost judgments (with post-judgment interest that were entered against Horton which exceed the policy limits of both the [Policies]."  [Doc. 161 at ¶ 17; Doc. 189 at ¶ 17; Doc. 161-3 at 5, 8].

## ANALYSIS

The Insurers move for summary judgment on their declaratory judgment claim, seeking a declaration that the Policies' Exclusion B.1 bars coverage for Ms. Abeyta's claim against Mr. Horton.  [Doc. 161 at 21].  They also move for judgment in their favor on each of Defendants' counterclaims, also based on a lack of coverage.  [*Id.*].  Meanwhile, Mr. Horton moves for summary judgment in that he asks the Court to find (1) "coverage in his favor," and (2) "that USAA and Garrison can't claim the benefit of any provision to avoid coverage."  [Doc. 131 at 21].  The Court addresses coverage first before turning to the Parties' remaining arguments.

## I.    Whether Plaintiffs Are Permitted to Assert Lack of Coverage

Before turning to the merits of the Parties' arguments, the Court must first address two threshold arguments.  First, Mr. Horton argues that Plaintiffs "waived or are estopped from asserting no coverage under the policies by their conduct and prejudice to Horton." [Doc. 172 at 16–17; Doc. 131 at 20–21].  In the alternative, in his affirmative Motion for Partial Summary Judgment, Mr. Horton argues that the Insurers each breached their

duties to indemnify (and thus breached the Policies) and, as a result, they "can't claim the benefit of any provision to avoid coverage."  [Doc. 131 at 19].

### A.    Waiver or Estoppel

Mr. Horton argues that Plaintiffs waived their lack of coverage argument, or should be estopped from arguing that Exclusion B.1 bars coverage in this case, because Plaintiffs did not disclaim coverage under Exclusion B.1 until years after the collision.  [*Id.* at 19–20; Doc. 172 at 16–17].  He relies on caselaw stating, in dicta, that "[a]n insurer should raise (or at least reserve) all defenses within a reasonable time after learning of such defenses, or those defenses may be deemed waived or the insurer may be estopped from raising them."  *U.S. Fid. & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 210 n.3 (Colo. 1992) (citing Allan D. Windt, *Insurance Claims and Disputes* §§ 2.23–2.24 at 68–75 (2d ed. 1988)).  Mr. Horton argues that, because the Insurers did not invoke Exclusion B.1 within "a reasonable time," they should not be permitted to now argue that Exclusion B.1 bars coverage.  *See* [Doc. 131 at 20; Doc. 172 at 16–17].

"[W]aiver and estoppel are distinct concepts."  *Gosman v. State Farm Mut. Auto. Ins. Co.*, No. 06-cv-00688-WDM-CBS, 2008 WL 239571, at *6 (D. Colo. Jan. 25, 2008); 7 Couch on Insurance § 101:8 (3d ed. Dec. 2024 update) ("Waiver involves an intentional relinquishment of policy right.  Estoppel applies where the insured has relied on the insurer's conduct to its detriment." (footnote omitted)).  Mr. Horton, however, does not make clear arguments under the separate doctrines—rather, he merely asserts that "USAA and Garrison waived or are estopped from asserting no coverage under the policies by their conduct and prejudice to Horton."  [Doc. 131 at 20–21]; *see also* [Doc. 172 at 16–17].  To the extent he argues that the Insurers *waived* their no-coverage

arguments, the Court respectfully disagrees. "[W]hile an insurer can waive a defense that amounts to a 'forfeiture of a policy,' coverage and exclusion issues are *not* subject to waiver." *Gallegos v. Safeco Ins. Co. of Am.*, 646 F. App'x 689, 695 (10th Cir. 2016) (emphasis added) (quoting *Hartford Live Stock Ins. Co. v. Phillips*, 372 P.2d 740, 742 (Colo. 1962)). Neither waiver nor estoppel may "bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom." *McGowan v. State Farm Fire & Cas. Co.*, 100 P.3d 521, 526 (Colo. App. 2004) (quoting *Empire Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 764 P.2d 1191, 1198 (Colo. 1988)).

However, in the context of estoppel, there is an exception to this rule that "exists upon proof of three facts": (1) the insurer "knew of the noncoverage"; (2) the insurer "assumed defense of the action without a reservation of rights"; and (3) the insured "relied to its detriment on the insurer's defense." *Evanston Ins. Co. v. L. Off. of Michael P. Medved, P.C.*, 890 F.3d 1195, 1201 (10th Cir. 2018) (citing *Mgmt. Specialists, Inc. v. Northfield Ins. Co.*, 117 P.3d 32, 37–38 (Colo. App. 2004)). But although Mr. Horton bears the burden of showing that estoppel applies, *see Nicholls v. Zurich Am. Ins. Grp.*, 244 F. Supp. 2d 1144, 1157 (D. Colo. 2003), he never explains how he satisfies the elements of this exception. Instead, he only argues that he was prejudiced. *See* [Doc. 131 at 20–21 (arguing that the Insurers should be estopped from denying coverage "by their conduct and prejudice to Horton"); Doc. 152 at 14–15 (same); Doc. 172 at 16–17 (arguing that the Insurers' arguments about non-coverage were not raised "within a reasonable time, so the Court should find waiver or estoppel as a matter of law" (quotation omitted))]. The Court cannot act as Mr. Horton's advocate or construct arguments on his behalf. *Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014).

To the extent Mr. Horton's prejudice-related argument could be construed as a contention that this exception applies, the argument is still insufficient to demonstrate that the Insurers should be estopped from arguing that Exclusion B.1 bars coverage.  As a preliminary matter, there is no evidence that USAA—which insured Daniel Horton, not Nathan Horton—ever assumed a defense of Nathan Horton.  *See* [Doc. 172 at 18 (Mr. Horton asserting that "it is undisputed that USAA never defended Horton in the underlying action")].  Therefore, with respect to USAA, Mr. Horton cannot meet his burden of establishing that the estoppel exception applies.  *Evanston Ins. Co.*, 890 F.3d at 1201; *see also Trujillo v. State Farm Mut. Auto. Ins. Co.*, No. 18-cv-00410-WJM-NRN, 2019 WL 3996882, at *7 (D. Colo. Aug. 23, 2019) (concluding that estoppel did not apply where the insurer did not assume and conduct a defense of a third-party action against its insured); 14A Couch on Insurance § 202:56 ("[An] insurer may not be estopped to raise [a no-coverage argument] if the insurer did not undertake the defense.").  The Court thus limits its remaining analysis to Garrison.

To avoid Plaintiffs' Motion for Summary Judgment as to lack of coverage due to estoppel, Mr. Horton must demonstrate at least a genuine issue of material fact[7] that (1) Garrison knew of facts indicating noncoverage; (2) Garrison assumed its defense of Mr. Horton without a reservation of rights; and (3) Mr. Horton relied, to his detriment, on Garrison's defense.  *Evanston Ins. Co.*, 890 F.3d at 1201.  It is undisputed that, in October 2019, the Insurers disclaimed coverage and expressly mentioned Exclusion B.2.  [Doc.

---

[7] To prevail on his own Motion for Partial Summary Judgment as to estoppel, Mr. Horton must meet a higher bar, i.e., he must establish that there is no genuine issue of material fact as to any of the elements, thereby warranting judgment as a matter of law in his favor. *Pelt*, 539 F.3d at 1280.

161-5 at 2–3]. It is further undisputed that Garrison acknowledged Ms. Abeyta's claim against Mr. Horton in March 2021, [Doc. 131-9 at 1], hired Wheeler Trigg O'Donnell to defend Mr. Horton in August 2021, [Doc. 62 at ¶ 21], and reserved its right to deny coverage and specifically mentioned Exclusion B.1 in the October 2021 Letter, [Doc. 64-12 at 3–4].

Because Mr. Horton must prove that he was prejudiced by Garrison's assumption of the underlying defense, *Evanston Ins. Co.*, 890 F.3d at 1201, the relevant time period for assessing prejudice is thus between Garrison's assumption of the defense. *See Evanston Ins. Co.*, 890 F.3d at 1201 (in evaluating prejudice for estoppel purposes, focusing on the nine-month period between when the insurer assumed the defense under a reservation of rights, but "without explaining the reasons for the reservation," and when the insurer sent another reservation-of-rights letter "that supplied the[] reasons" for the reservation of rights); *see also Gulf Ins. Co. v. State*, 607 P.2d 1016, 1019 (Colo. 1979) ("In order to establish estoppel, it must appear, inter alia, that the [insured] *relied upon [the insurer's] defense of the suit* to its detriment." (emphasis added)). Here, Mr. Horton claims that Garrison assumed the defense in August 2021, *see* [Doc. 172 at 8 ¶ 46; *id.* at 19]—and it is undisputed that Garrison reserved its right to deny coverage under Exclusion B.1 in the October 2021 Letter, [Doc. 64-12 at 3–4].

In his Motion for Partial Summary Judgment, Mr. Horton argues that he "is prejudiced" and sets forth a nine-step timeline of some of Garrison's conduct. [Doc. 131 at 20–21]. But while Mr. Horton certainly takes issue with Garrison's handling of the underlying claim, his arguments of "prejudice" read as a critique of Garrison's claims-handling and litigation conduct as a whole, without connecting the dots between

Garrison's assumption of the defense and any particularized prejudice.  The relevant inquiry is not whether Mr. Horton was prejudiced by Garrison's pre-2021 erroneous position about who owned the motorcycle, *see* [Doc. 131 at 20], Garrison's purported failure to alert Mr. Horton of Ms. Abeyta's settlement offers, [*id.*], or Garrison's purported delay in invoking Exclusion B.1, [*id.* at 21].  Instead, Mr. Horton must show that he was prejudiced *by Garrison's assumption of the defense* against Ms. Abeyta's claim.  *Mgmt. Specialists*, 117 P.3d at 38; *cf. Bd. of Cnty. Comm'rs v. Guarantee Ins. Co.*, 90 F.R.D. 405, 409 (D. Colo. 1981) (mere delay in disclaiming coverage is insufficient to invoke estoppel when the insured has an "adequate opportunity to defend," including by negotiating settlement).  Moreover, the mediation and trial occurred *after* Garrison informed Mr. Horton of its position that Exclusion B.1 precluded coverage, [Doc. 63 at ¶¶ 23, 25–26], and it is undisputed that when Mr. Horton was asked if he could identify anything he would have done differently if he received the October 2021 Letter earlier, he answered "I don't know," and stated that it would be "fair" to say that he would have not done "anything different because of th[e] letter."  [Doc. 135-1 at 128:8–129:2].  *Cf. Evanston Ins. Co.*, 890 F.3d at 1201 (finding no prejudice where "[a]ll settlement negotiations occurred after [the insured] knew the details of [the insurer's] coverage position, and there [was] no evidence that the parties could have agreed on a settlement amount before [the insured] obtained [the insurer's] explanation for its reservation of rights").

Focusing on the relevant timeframe, Mr. Horton asserts only that Garrison "delayed hiring defense counsel for Horton until August 2021 (6 months after he was served)." [Doc. 131 at 20–21].  This assertion, however, is unaccompanied by any explanation or

evidence that Mr. Horton was *actually prejudiced* by this delay, and is thus insufficient to create a genuine dispute of material fact. *Cf. Guarantee Ins. Co.*, 90 F.R.D. at 409 (delay insufficient to invoke estoppel when insured has adequate opportunity to negotiate settlement). Indeed, again, Mr. Horton concedes that even if he had received the October 2021 Letter earlier (and thus had known of Garrison's reliance on Exclusion B.1 at an earlier time during Garrison's defense), he did not know whether he would have done anything differently, and that it would be "fair" to say that he would not have done "anything different because of th[e] letter." [Doc. 161 at ¶ 43; Doc. 172 at 7 ¶ 43; Doc. 189 at ¶ 43; Doc. 135-1 at 128:8–129:2].

In sum, Mr. Horton has not demonstrated that this Court may ignore the general rule that estoppel "cannot create coverage for risks falling outside of the insurance policy," *Evanston Ins. Co.*, 890 F.3d at 1200, or identified any dispute of fact that must be decided by a jury. The Court agrees with Plaintiffs that they are not estopped from arguing that there is no coverage under the Policies under Exclusion B.1.

**B.    Preclusion by Breach**

Alternatively, Mr. Horton argues that Garrison and USAA each breached their respective Policy first and, as a result, the Insurers are precluded from "holding the terms of the Policies against Horton." [Doc. 131 at 16 (emphasis omitted)]. Mr. Horton's argument relies on *Coors v. Security Life of Denver Insurance Co.*, 112 P.3d 59 (Colo. 2005). In *Coors*, an insurer breached the insurance policy by overcharging its insured, and the insured rescinded the policy. *Id.* at 62–63. The insurer then tried to enforce the policy's early termination penalty. *Id.* at 63. The Colorado Supreme Court concluded that the insurer could not enforce the termination provision because "[u]nder contract law, a

party to a contract cannot claim its benefit where he is the first to violate its terms." *Id.* at
64.

"The 'prior breach' doctrine is an equitable argument typically asserted by a
defendant who has been sued for specific performance by a plaintiff who was the first to
breach the contract." *DTC Energy Grp. v. Hirschfeld*, 912 F.3d 1263, 1274 (10th Cir.
2018) (first citing *In re Country World Casinos, Inc.*, 181 F.3d 1146, 1150 (10th Cir. 1999),
and then citing *Sci. Packages, Inc. v. Gwinn*, 301 P.2d 719, 722 (Colo. 1956) (en banc)).
Mr. Horton does not cite any case law applying the "prior breach" doctrine to preclude an
insurance company from arguing that no coverage exists under an insurance policy due
to the insurer's purported first breach of the policy. *See* [Doc. 131 at 16–19].

*Coors* does not apply here.  Plaintiffs are not attempting to enforce a contractual
right in the Policies; rather, their argument is that the subject dispute is outside of the
scope of the Policies and there is no coverage. *See DTC Energy Grp.*, 912 F.3d at 1274
(affirming district court's conclusion that prior breach doctrine was inapplicable where the
plaintiff "[sought] to use the doctrine as a sword to create liability for [the defendant] where
the text of [the parties'] agreement provide[d] for none"); *cf. Leprino Foods Co. v. Factory
Mut. Ins. Co.*, 653 F.3d 1121, 1134 (10th Cir. 2011) ("*Coors* is not on point because
Factory Mutual's argument is based on the prohibition of double recovery under Colorado
law, not a contractual right in the policy.").  Accordingly, the Court is respectfully
unpersuaded by Mr. Horton's argument.  And having concluded that the Insurers are not
precluded from arguing that the Policies do not afford coverage, the Court turns to the
merits of those arguments.

II.    **Whether Coverage Exists**

A.    **Interpreting Insurance Policies Under Colorado Law**

The interpretation of an insurance policy is a question of law for a court to decide. *FDIC v. Bowen*, 865 P.2d 868, 870 (Colo. App. 1993).  Because the Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, *see* [Doc. 29 at ¶ 5], the Court applies the substantive law of the forum state, including the forum's choice-of-law rules, *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009) (applying Colorado law).  In Colorado, the interpretation of an insurance policy is "governed by the law of the state with the most significant relationship to the insurance contract." *Id.*  Here, the Parties raise arguments under Colorado law and appear to agree that Colorado law applies.  *See, e.g.*, [Doc. 161 at 12; Doc. 172 at 11–12; Doc. 189 at 14]. The Court follows the Parties' lead.  *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

"An insurance policy's terms are construed according to principles of contract interpretation:  a court seeks to give effect to the intent and reasonable expectations of the parties." *Auto-Owners Ins. Co. v. High Country Coatings, Inc.*, 388 F. Supp. 3d 1328, 1333 (D. Colo. 2019).  "[W]ords should be given their plain and ordinary meaning unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended." *Chacon v. Am. Fam. Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990).  "In determining the plain and ordinary meaning of a term in an insurance policy, the Colorado Supreme Court has eschewed the use of 'technical readings' and instead looks to 'what meaning a person of ordinary intelligence would attach to' a policy term."

*Sullivan v. Nationwide Affinity Ins. Co. of Am.*, 842 F. App'x 251, 254 (10th Cir. 2021) (quoting *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1051 (Colo. 2011)); *see also Bush v. State Farm Mut. Auto. Ins. Co.*, 101 P.3d 1145, 1146 (Colo. App. 2004) (explaining that courts interpreting insurance policies "give the words their plain meaning, avoid strained and technical interpretations, and construe the contract as would a reasonable person of ordinary intelligence").

If the terms of an insurance policy are ambiguous, i.e., they are "susceptible to more than one reasonable interpretation," *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 288 (Colo. 2005), then the policy is construed against the drafter and in favor of coverage, *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 820 (Colo. 2004). However, disagreement between the parties as to the meaning of policy provisions does not render the policy ambiguous. *Ad Two, Inc. v. City & Cnty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 377 (Colo. 2000).

### B.    The Policies

The Insurers argue in their Motion for Summary Judgment that there is no coverage under the Policies for Ms. Abeyta's claim against Mr. Horton and they are entitled to summary judgment on their declaratory judgment claim. [Doc. 161 at 12–13]. They focus on Exclusion B.1, which they say "excludes any vehicle that is not your covered auto, unless it meets one of the four listed exceptions," and because "motorcycle" is defined elsewhere in the Policies and does not fall within one of Exclusion B.1's exceptions, there is no coverage. [*Id.* at 13].

Mr. Horton does not contest the Insurers' argument that the motorcycle does not fall within the definition of "your covered auto" and does not fall within one of Exclusion

B.1's four exceptions. [Doc. 172 at 9–10].[8] Instead, he points to Exclusions B.2 and B.3 and argues that coverage exists under the *exceptions* to these Exclusions. [*Id.* at 10–13]. He argues that the Policies "provide 2 different types of liability coverage": first, there is "primary coverage" for "your covered auto," i.e., vehicles listed on the Declarations page; and second, the Policies provide "excess coverage" for "a 'non-owned vehicle' that is not listed on the declarations page." [*Id.* at 9]. He contends that Exclusions B.2 and B.3 "trigger[] coverage" for the motorcycle as a "non-owned vehicle." [*Id.* at 10–11]. In the alternative, Mr. Horton asserts that Exclusion B.1 conflicts with the exceptions in Exclusions B.2 and B.3 and that this "conflict creates an ambiguity which must be construed in favor of coverage." [*Id.* at 11–12].

    ***Exclusion B.1.*** Broadly speaking, the Policies provide coverage for bodily injury or property damage for which a covered person becomes legally responsible; covered person means, inter alia, a person using "your covered auto." [Doc. 64-1 at 24; Doc. 64-2 at 17]. And, pertinent here, "your covered auto" is defined to include "[a]ny vehicle shown on the Declarations." [Doc. 64-1 at 23; Doc. 64-2 at 16].

    Exclusion B.1 excludes insurance coverage for "[a]ny vehicle that is not your covered auto unless that vehicle is" either (a) a "four- or six-wheel land motor vehicle designed for use on public roads"; (b) a "moving van for personal use"; (c) a "miscellaneous vehicle"; or (d) a "vehicle used in the business of farming or ranching." [Doc. 64-1 at 26; Doc. 64-2 at 19 (emphasis omitted)]. It is undisputed that the motorcycle was not listed on the Declarations page and was not classified as "your covered auto."

---

[8] Mr. Horton does argue that it was "not possible" for Daniel Horton to list the motorcycle on the Declarations page. [Doc. 172 at 9–10]. However, this argument is not material to the question of whether the motorcycle is insured under either of the Policies.

[Doc. 161 at ¶ 4; Doc. 172 at 2 ¶ 4; Doc. 189 at ¶ 4].  And Mr. Horton does not argue that the motorcycle is a four- or six-wheel vehicle, a moving van, a miscellaneous vehicle, or a farming or ranching vehicle, so as to make it fit within one of the exceptions to Exclusion B.1.  *See generally* [Doc. 172]; *see also* [Doc. 64-1 at 22–23; Doc. 64-2 at 15–16 (defining "motorcycle" and "miscellaneous vehicle")].  Accordingly, on its face, Exclusion B.1 plainly excludes coverage for Daniel Horton's motorcycle.

*Exclusions B.2 and B.3.*  Still, Mr. Horton argues that even if coverage is excluded under Exclusion B.1, coverage is triggered *again* by the exceptions in Exclusions B.2 and B.3.  *See* [Doc. 172 at 10–11].  He argues that these Exclusions provide "excess coverage" for "non-owned vehicles" that are not listed on the Declarations page and do not fit within the "your covered auto" definition.  [*Id.* at 9].  As a refresher, these Exclusions state:

> B. **We** do not provide Liability Coverage for the ownership, maintenance, or use of:
>
> > . . .
>
> > 2. Any vehicle, other than **your covered auto**, that is owned by **you**, or furnished or available for **your** regular use.  This exclusion (B.2) does not apply to a vehicle not owned by **you** if the vehicle's owner has valid and collectible primary liability insurance or self-insurance in force at the time of the accident.
> >
> > 3. Any vehicle, other than **your covered auto**, that is owned by or furnished or available for the regular use of, any **family member**.  This exclusion (B.3) does not apply:
> >
> > > a. To your maintenance or use of such vehicle; or
> > >
> > > b. To a vehicle not owned by any **family member** if the vehicle's owner has valid and collectible primary liability insurance or self-insurance in force at the time of the accident.

[Doc. 64-1 at 26; Doc. 64-2 at 19].

Mr. Horton argues that, under the Policies, "coverage is still triggered on an excess basis if it is a 'non-owned vehicle.'" [Doc. 172 at 10]. This assertion is not supported by any direct citation to Policy language. Nevertheless, he contends that, under the Garrison Policy, the exception to Exclusion B.2 "triggers coverage" for a vehicle not listed on the Declarations page (and thus not a "your covered auto") if it was (1) not owned by the insured; and (2) the vehicle's owner insured the vehicle with another carrier. [Doc. 172 at 10–11]. He also argues that the Garrison Policy provides coverage through the first exception to Exclusion B.3, which he says "triggers coverage" for a vehicle not listed on the Declarations page if (1) the vehicle was owned by a family member; and (2) the insured was using the vehicle. [*Id.* at 11]. And as for the USAA Policy, he argues that the second exception to Exclusion B.3 "triggers coverage" for a vehicle not listed on the Declarations page if (1) the vehicle's owner insured the vehicle through another carrier; and (2) the vehicle was not owned by any family member. [*Id.*]. The Court respectfully disagrees with these arguments.

An exclusion is an "insurance policy provision that excepts certain events or conditions from coverage." *Dupre v. Allstate Ins. Co.*, 62 P.3d 1024, 1029 (Colo. App. 2002) (quotation omitted); *see also Exclusion*, Black's Law Dictionary (12th ed. 2024) (defining "exclusion" as "[a]n insurance provision that disclaims coverage for certain property, losses, events, acts, omissions, parties, or conditions"). "Exceptions to exclusions narrow the scope of the exclusion and, as a consequence, add back coverage." *Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1289 (10th Cir. 2011) (quotation omitted) (applying Colorado law). "But it is the initial broad grant of coverage, not the exception to the exclusion, that ultimately creates (or does not

create) the coverage sought." *Id.* (quotation omitted); *Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd*, 882 F.3d 952, 958 (10th Cir. 2018) (explaining that "exclusions are . . . subject to exceptions, which restore coverage—but only to the extent coverage was initially included in the basic insuring agreement"). Therefore, to the extent Mr. Horton suggests that these exceptions work to create "excess" coverage, the Court respectfully disagrees.

Moreover, the Policies' plain language makes clear that the exceptions to Exclusions B.2 and B.3 apply *only to those Exclusions*. The exception to Exclusion B.2 states: "**This exclusion (B.2.)** does not apply to a vehicle not owned by you if the vehicle's owner has valid and collectible primary liability insurance." [Doc. 64-1 at 26; Doc. 64-2 at 19 (emphasis altered)]. Similarly, Exclusion B.3 states: "**This exclusion (B.3.)** does not apply . . . [t]o a vehicle not owned by any family member if the vehicle's owner has valid and collectible primary liability insurance." [Doc. 64-1 at 26; Doc. 64-2 at 19 (emphasis altered)]. In other words, while Exclusions B.2 and B.3 generally exclude from coverage a vehicle owned or regularly used by the insured or a family member that is not listed on the Declarations page, the Exclusions contain a narrow carve-out for a vehicle that is not owned by the insured or the family member if the vehicle is otherwise covered by primary liability insurance. But these exceptions do not operate to create coverage themselves, nor do they operate as an exception to Exclusion B.1. *See Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004) ("An exception pertains only to the exclusion clause within which it appears; the applicability of an exception will not create coverage if the insuring agreement precludes it or if a separate exclusion applies.").

***There is No Conflict Between Exclusion B.1 and Exclusions B.2 and B.3.*** In the alternative, Mr. Horton argues that Exclusion B.1 conflicts with the exceptions in Exclusions B.2 and B.3 because Exclusion B.1 "purports to exclude coverage for a vehicle that is not 'Your Covered Auto,' . . . [b]ut this ignores that coverage is restored for 'non-owned vehicles' not listed on the declarations." [Doc. 172 at 12]. But as the Court has already explained, the exceptions to Exclusions B.2 and B.3 do not create coverage and do not "restore[]" coverage excluded under Exclusion B.1.

All three Exclusions exclude coverage for vehicles that do not fall within the definition of "your covered auto," *see* [Doc. 64-1 at 26; Doc. 64-2 at 19], but they carve out *different kinds* of exceptions to this coverage exclusion. Exclusion B.1 focuses on the *type* of vehicle that is excepted from the coverage exclusion: certain land motor vehicles; moving vans for personal use; miscellaneous vehicles; and farming or ranching vehicles. [Doc. 64-1 at 26; Doc. 64-2 at 19]. Exclusions B.2 and B.3 relate to ownership and use: they exclude from coverage the vehicles the insured (or a family member) owns or regularly uses that are not listed in the "your covered auto" section, but except from that exclusion vehicles that the insured does not own and that are otherwise covered by primary liability insurance. [Doc. 64-1 at 26; Doc. 64-2 at 19]; *see also Sheldon v. Hartford Ins. Co.*, 189 P.3d 695, 699 (N.M. Ct. App. 2008) (explaining that the purpose of such exclusions is to "prevent the insured from purchasing an insurance contract to cover the risk of operating one vehicle, and obtaining coverage on another vehicle that is regularly used in the household").

These Exclusions can and must be read in harmony. *Cyprus Amax Mins. Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003) ("Courts should read the provisions of

the policy as a whole, rather than reading them in isolation."); *Progressive Specialty Ins. Co. v. Hartford Underwriters Ins. Co.*, 148 P.3d 470, 474 (Colo. App. 2006) (policies must be construed "as a whole and . . . so that all provisions are harmonious and none is rendered meaningless").  Because they relate to different subject matters and provide different types of coverage limitations, Exclusion B.1 does not conflict with Exclusions B.2 or B.3.  For coverage to attach, none of the three Exclusions can apply.

Take an undeclared, insured-owned, four-wheel land motor vehicle that is designed for use on public roads.  The vehicle would not be excluded from coverage under Exclusion B.1, as it falls within one of the four enumerated exceptions to that Exclusion.  But the vehicle *would still be excluded* under Exclusion B.2 because it is owned by the insured and not listed on the Declarations page.  The opposite scenario exists here:  even assuming, without deciding, that the motorcycle would fall within an exception to Exclusions B.2 or B.3, this does not negate the fact that the motorcycle is excluded from coverage under Exclusion B.1.

The Court is respectfully unpersuaded by the authority cited by Mr. Horton in urging the Court to find a conflict.  *See* [Doc. 172 at 11; Doc. 131 at 11].  In *Simon v. Shelter General Insurance Co.*, 842 P.2d 236 (Colo. 1993), a general liability policy excluded coverage for liability "assumed by the insured under any contract or agreement," but also contained an exception to this exclusion for warranties of fitness, quality, and workmanlike performance.  *Id.* at 238.  The policy also contained separate endorsements that excluded coverage for injuries or damage "arising out of . . . reliance upon a representation or warranty."  *Id.* at 239.  The Colorado Supreme Court concluded that these two provisions were "in conflict respecting the policy's coverage for liability resulting from product

warranties." *Id.* at 240.  In *Simon*, and unlike here, the two conflicting provisions could not be read in harmony:  one exclusion purported to bar coverage for injuries arising out of reliance on warranties, while another exclusion expressly exempted warranties, thereby "adding back" coverage for warranties.  It was thus impossible to give effect to both, as giving effect to the endorsement exclusion would render the warranty exception meaningless.  This is distinguishable from the instant case, where the Policy provisions can be read together so that each is given effect and none is rendered meaningless.  *See Blackhawk-Cent. City Sanitation Dist. v. Am. Guarantee & Liab. Ins. Co.*, 214 F.3d 1183, 1190 (10th Cir. 2000) (finding *Simon* inapplicable where there was no conflict); *United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951, 963 (10th Cir. 2011) (same).[9]

In sum, the Court finds as follows:  (1) there is no conflict between Exclusions B.1 and Exclusions B.2 and B.3; and (2) Exclusion B.1 unambiguously bars coverage here.

For these reasons, Plaintiffs' Motion for Summary Judgment is **GRANTED** to the extent it seeks judgment in Plaintiffs' favor on their declaratory judgment claim, and the Horton Motion for Partial Summary Judgment is **DENIED**.  *See* [Doc. 131 at 21 (Mr. Horton moving the Court to "find: 1) coverage in his favor; and 2) that USAA and Garrison can't claim the benefit of any provision to avoid coverage, since they breached the policies first, and/or since they are waived or estopped from asserting no coverage")].

---

[9] Similarly, the Court is respectfully unpersuaded by Mr. Horton's reliance on *State Farm Mutual Automobile Insurance Co. v. Nissen*, 851 P.2d 165 (Colo. 1993), which too involved an irreconcilable conflict within the policy, *see id.* at 166–68.

III.    **Defendants' Counterclaims**

The Insurers also seek summary judgment in their favor on Defendants'
counterclaims.  [Doc. 172 at 17–21].

A.    **Breach of Contract**

Mr. Horton brings a breach of contract counterclaim against both Plaintiffs.  [Doc.
63 at ¶¶ 32–38].  Mr. Horton does not identify which provision of the Policies either Insurer
allegedly failed to perform.  *See* [*id.*]; *see also* [Doc. 172].  Plaintiffs argue that, "[b]ecause
the Policies unambiguously exclude coverage, . . . the Court should enter judgment as a
matter of law in favor of Plaintiffs . . . and against Horton on his breach-of-contract
counterclaim."  [Doc. 161 at 14].  Mr. Horton does not respond to this argument.  *See*
[Doc. 172 at 17–21 (arguing only with respect to "willful and wanton breach of contract"
and statutory bad faith)].  But elsewhere, Mr. Horton asserts that the Court "should find,
sua sponte, that USAA breached its contract as a matter of law, and allow [his] breach of
contract claim to proceed to determine the amount of damages."  [*Id.* at 21].[10]

"In order to prevail on a breach of contract claim pursuant to an insurance policy,
the insured must first show that there was coverage under the policy."  *Jenkins v. State
Farm Fire & Cas. Co.*, No. 15-cv-02691-CMA-NYW, 2017 WL 11544767, at *2 (D. Colo.
May 31, 2017).  Thus, "without coverage there can be no breach of contract."  *Tom's Urb.*

---

[10] This request is not properly before the Court.  *See* D.C.COLO.LCivR 7.1(d) ("A motion
shall not be included in a response or reply to the original motion.").  Moreover, the Court
does not consider Mr. Horton's arguments in his own Motion for Partial Summary
Judgment that the Insurers "materially breached the contract."  *See* [Doc. 131 at 16, 18
(emphasis omitted)]; *see also Banner Bank*, 916 F.3d at 1326 (cross motions for summary
judgment "are treated as two individual motions for summary judgment").  If Mr. Horton
sought to avoid summary judgment on his breach of contract claim, it was incumbent
upon him to raise arguments in response to Plaintiff's affirmative motion.

*Master LLC v. Fed. Ins. Co.*, No. 20-cv-03407-PAB-SKC, 2022 WL 974654, at *7 (D. Colo. Mar. 31, 2022); *see also, e.g.*, *Markel Ins. Co. v. Hollandsworth*, 400 F. Supp. 3d 1155, 1160 (D. Colo. 2019) (finding that breach of contract claim "fail[ed] as a matter of law" as a result of the court's conclusion that there was no coverage); *Wagner v. Am. Fam. Ins.*, 968 F. Supp. 2d 1100, 1107 (D. Colo. 2013) (concluding that "there was no breach of the contract because there was no coverage for [the insured's] loss"), *aff'd*, 569 F. App'x 574 (10th Cir. 2014).  The Court has concluded there is no coverage, Mr. Horton has not identified any particular contractual provision he asserts the Insurers violated, and he does not direct the Court to any genuine issues of material fact that would preclude judgment in the Insurers' favor.  Accordingly, the Court finds that summary judgment in Plaintiffs' favor on Mr. Horton's breach of contract claim is appropriate.  *See Larson v. One Beacon Ins. Co.*, No. 12-cv-03150-MSK-KLM, 2013 WL 5366401, at *10 (D. Colo. Sept. 25, 2013) ("Summary judgment is appropriate on the contract claim because Plaintiff has failed to show nonperformance of the contract.").  Plaintiff's Motion for Summary Judgment is **GRANTED** with respect to Mr. Horton's breach of contract claim.

### B.    Willful and Wanton Breach of Insurance Contract

Mr. Horton also brings a claim for "willful and wanton breach of insurance contract." [Doc. 63 at 7 (emphasis omitted)].  The Insurers argue that they are entitled to judgment on this claim because no such claim exists under Colorado law.  They contend that "'the willful-and-wanton rule' under Colorado law concerns the measure of damages available for a breach-of-contract claim but does not provide for a distinct cause of action."  [Doc.

161 at 21].  In response, Mr. Horton argues that "Colorado specifically recognizes a claim for willful and wanton breach of contract."  [Doc. 120 at 16 (citing cases)].[11]

The cases cited by Mr. Horton do not establish a standalone claim for "willful and wanton breach of contract" that is separate and distinct from an ordinary breach of contract action.  First, Mr. Horton cites *Giampapa v. American Family Mutual Insurance Co.*, 64 P.3d 230 (Colo. 2003), and *Decker v. Browning-Ferris Industries of Colorado, Inc.*, 931 P.2d 436 (Colo. 1997), asserting that these cases "authoriz[e]" such a claim, *see* [Doc. 120 at 16].  But "*Giampapa* and *Decker* contemplate the extent of damages available for a breach of contract when such a breach is willful and wanton.  The cases do not create a distinct cause of action separate from common law breach of contract." *Halprin v. Equitable Life Assurance Soc'y of U.S.*, 267 F. Supp. 2d 1030, 1033 (D. Colo. 2003).  Other cases similarly *refer* to a claim for "willful and wanton breach of contract," but do not expressly recognize a standalone, separate claim.  *See Core-Mark Midcontinent, Inc. v. Sonitrol Corp.*, 300 P.3d 963, 969 (Colo. App. 2012).[12]

---

[11] This Court has previously admonished the Parties for incorporating arguments raised in prior briefing as "an improper attempt to circumvent the Court's page limitations."  *See* [Doc. 174]; *see also* NYW Civ. Practice Standard 10.1(c)(2) (limiting summary judgment motions and responses to 20 pages).  Because both Plaintiffs and Mr. Horton incorporate arguments with respect to the claim for willful and wanton breach, *see* [Doc. 161 at 21; Doc. 172 at 17], and because they did so prior to the Court's admonishments, the Court will consider those limited extraneous arguments.

[12] Mr. Horton also directs the Court to *Allen v. American Family Mutual Insurance Co.*, 80 P.3d 799, 801 (Colo. App. 2002), *aff'd in part, rev'd in part*, 102 P.3d 333 (Colo. 2004), recognizing that the plaintiffs in *Allen* "assert[ed] claims for both breach of contract and willful and wanton breach," [Doc. 120 at 16].  It is unclear whether the *Allen* plaintiffs asserted a standalone claim for "willful and wanton conduct" or simply sought heightened relief on that basis, but in any event, even if the *Allen* plaintiffs did so, neither the Colorado Supreme Court nor the Colorado Court of Appeals engaged in any analysis about the propriety of such a claim.  *See* 80 P.3d 799; 102 P.3d 333.

The Court agrees with other courts in this District who have concluded there is no standalone claim for "willful and wanton breach of contract." *Halprin*, 267 F. Supp. 2d at 1033; *Aurzadniczek v. Humana Health Plan, Inc.*, No. 15-cv-00146-RM-KMT, 2016 WL 1266972, at *12 (D. Colo. Apr. 1, 2016). Moreover, as Plaintiffs argue, *see* [Doc. 161 at 21], such a claim is nonviable due to lack of coverage, *see supra* Section II.A. Accordingly, Plaintiffs' Motion for Summary Judgment is respectfully **GRANTED** as to Mr. Horton's claim for willful and wanton breach of insurance contract.

### C.    Bad Faith

There are two types of insurance-related bad faith claims available under Colorado law. First, Colorado statutes impose certain obligations on insurance companies, instructing that insurers "shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant." Colo. Rev. Stat. § 10-3-1115(1)(a). A claim alleging an unreasonable delay or denial of insurance benefits under this statute is often referred to as a "statutory bad faith" claim. *Gardner v. State Farm Mut. Auto. Ins. Co.*, 639 F. Supp. 3d 1158, 1163 (D. Colo. 2022). To succeed on this claim, the insured must establish that (1) the insurer delayed or denied payment of benefits to the insured, and (2) the delay or denial was without a reasonable basis. *Am. Fam. Mut. Ins. Co. v. Barriga*, 418 P.3d 1181, 1185–86 (Colo. 2018).

Insurers also have a common law duty to deal in good faith with their insureds. *Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 342 (Colo. 2004). "Due to the 'special nature of the insurance contract and the relationship which exists between the insurer and the insured,' an insurer's breach of the duty of good faith and fair dealing gives rise to a separate cause of action arising in tort." *Goodson v. Am. Standard Ins. Co. of Wis.*,

89 P.3d 409, 414 (Colo. 2004) (quoting *Cary*, 68 P.3d at 466).  "[A] claim of common law

bad faith imposes a more exacting standard of proof than a statutory claim."  *Cooper v.

Shelter Gen. Ins. Co.*, 653 F. Supp. 3d 873, 878 (D. Colo. 2023).  To prevail on a common

law claim, "the insured must prove that (1) the insurer's conduct was unreasonable and

(2) the insurer either had knowledge of or reckless disregard for the fact that its conduct

was unreasonable."  *Ayala v. State Farm Mut. Auto. Ins. Co.*, 628 F. Supp. 3d 1075, 1082

(D. Colo. 2022).

### 1.    Statutory Bad Faith

Mr. Horton's statutory bad faith claim alleges that the Insurers unreasonably

delayed and denied payments owed under the Policies.  [Doc. 63 at ¶ 49].  The Insurers

argue that Mr. Horton's statutory bad faith claim "depend[s] on the existence of coverage,"

and because there is no coverage, they are entitled to judgment in their favor on this

claim.  [Doc. 161 at 3]; *see also* [*id.* at 21 (arguing that "[l]iability under Section 10-3-1115

depends on the existence of a 'covered benefit' that is 'owed'")].  Mr. Horton disagrees

with this assertion, arguing that his "damages do not flow solely from the Court's coverage

determination[;] rather, his statutory bad faith claim rests on independent benefits owed

under the policy." [Doc. 172 at 17].  Specifically, he argues that (1) Garrison unreasonably

delayed payment of defense fees it owed to Wheeler Trigg O'Donnell for over 300 days;

(2) Garrison unreasonably delayed payment of post-judgment interest; (3) both Plaintiffs

"unreasonabl[y] deni[ed] . . . their duty to investigate"; (4) both Plaintiffs "unreasonabl[y]

deni[ed] . . . their duty to settle"; and (5) USAA "unreasonabl[y] deni[ed] . . . a defense as

a matter of law."  [*Id.* at 17–18].

Section 1115 states that an insurer "shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant."  Colo. Rev. Stat. § 10-3-1115(1)(a).  It is well-established that a claim for unreasonable delay or denial of benefits requires a showing that benefits are indeed owed under the subject insurance policy.  *See TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F. Supp. 3d 1170, 1201 (D. Colo. 2018) (to prevail on the claim, the plaintiff must provide that "(1) benefits were owed under the policy; and (2) defendant unreasonably delayed or denied payment of plaintiff's claim"); *Edge Constr., LLC v. Owners Ins. Co.*, No. 14-cv-00912-MJW, 2015 WL 4035567, at *6 (D. Colo. June 29, 2015) ("[I]n order to prevail on its statutory unreasonable delay/denial claim, [the plaintiff] first has to prove entitlement to benefits."), *aff'd sub nom. Sable Cove Condo. Ass'n v. Owners Ins. Co.*, 668 F. App'x 847 (10th Cir. 2016).  "[W]here no benefits are owed, then payment of those benefits cannot, as a matter of law, have been unreasonably delayed to the insured or denied by the insurer."  *Keller v. State Farm Mut. Auto. Ins. Co.*, No. 22-cv-00474-CMA-KAS, 2023 WL 6048790, at *9 (D. Colo. Sept. 15, 2023), *report and recommendation adopted*, 2023 WL 7458357 (D. Colo. Oct. 2, 2023).[13]

Mr. Horton's arguments to the contrary miss the mark.  First, he relies on this Court's decision in *Palm v. Esurance Property & Casualty Insurance Co.*, No. 20-cv-

---

[13] This is also distinct from the circumstance where the insurer has paid the insured's benefits in full, thereby precluding a claim for breach of contract.  In that scenario, the insured could potentially proceed with a statutory bad faith claim based on the insurer unreasonably delaying payment on the insured's claim.  *See Brookshire Downs at Heatherridge Condo. Ass'n v. Owners Ins. Co.*, No. 17-cv-00871-0WJM-NRN, 2019 WL 10946262, at *2 n.1 (D. Colo. Mar. 15, 2019) ("[A]n unreasonable delay claim could be viable independent of a breach of contract claim—*e.g.*, where the insurer has paid the policy limits but only after an inordinate amount of time.").

02838-NYW-STV, 2023 WL 2503511 (D. Colo. Mar. 14, 2023), to argue that his statutory claim can survive even if there is no coverage, *see* [Doc. 172 at 17]. But this Court's discussion in *Palm* addressed *common law* bad faith claims, not statutory ones. *See Palm*, 2023 WL 2503511, at *5. In Colorado, a common law bad faith claim "exists independently from the liability imposed by the insurance contract." *Flickinger v. Ninth Dist. Prod. Credit Ass'n of Wichita*, 824 P.2d 19, 24 (Colo. App. 1991). In other words, "Colorado recognizes the viability of a [common law] claim of bad faith even if the express terms of the contract have been honored by the insurer." *Dunn v. Am. Fam. Ins.*, 251 P.3d 1232, 1235 (Colo. App. 2010). A common law bad faith claim can survive a finding of no coverage if the claim "is based not on the denial of coverage, but on the defendant's alleged bad faith in the investigation, defense, handling, or settling of a claim." *Palm*, 2023 WL 2503511, at *5. The same is not true for statutory claims, which arise out of the unreasonable delay or denial of *covered benefits*. *See* Colo. Rev. Stat. § 10-3-1115(1)(a). On this same note, Mr. Horton's arguments that Plaintiffs "unreasonabl[y] deni[ed] . . . their duty to investigate" or settle are outside the scope of a statutory bad faith claim and are more akin to arguments asserted in support of a common law claim. *Cf. Palm*, 2023 WL 2503511, at *5 (contemplating a common law claim based on the defendant's "alleged bad faith in the investigation, defense, handling, or settling of a claim"). Mr. Horton does not maintain a common law claim; he has assigned his right to do so to Ms. Abeyta.

Because there is no coverage, Mr. Horton cannot succeed on a statutory bad faith claim. Plaintiffs' Motion for Summary Judgment is **GRANTED** with respect to Mr. Horton's statutory bad faith claim.

### 2.   Common Law Bad Faith

Finally, Plaintiffs seek judgment in their favor on Ms. Abetya's common law bad faith claim.  [Doc. 161 at 16].  They argue that her "only claimed damages flow from th[e] determination of no coverage" because it is undisputed that "[t]he only damages Abeyta claims is the amount of the excess judgment allegedly caused by Plaintiffs' failure to settle."  [*Id.* at 16, 19].  In Plaintiffs' view, their "tort liability depends on whether Plaintiffs had a duty to settle in October 2019 and June 2020, which, in turn, depends on the existence of coverage."  [*Id.* at 19].  And because there was no coverage, there was no duty to settle, and Ms. Abeyta cannot prevail on her bad faith claim.  [*Id.* at 19–20].  Plaintiffs do acknowledge Ms. Abeyta's "assertion that Plaintiffs conducted an inadequate investigation prior to rejecting coverage," but argue that this does not change the relevant analysis because this portion of the bad faith claim "still depends on the assertion that Plaintiffs breached their duty to settle," which "exists only if there is coverage under the Policies."  [*Id.* at 20 (emphasis omitted)].

Ms. Abeyta does not contest that her bad faith claim is based on a failure to settle. She asserts that, in Colorado, "the unreasonable failure to settle third-party liability claims within the insurance policy limits is evidence of bad faith and may subject the insurer to liability for a judgment beyond the policy limit and regardless of any policy limitations." [Doc. 189 at 16].  She argues that "between October 2019 and June 2020, . . . Insurers were provided two separate opportunities to settle, . . . and . . . these offers were spurned based on Insurers' faulty investigation and erroneous determination that [Nicholas] Horton owned the motorcycle in question rather than his father."  [*Id.* at 18–19].  She also argues

that "neither settlement opportunity was communicated to [Nicholas] Horton, which is bad faith in and of itself." [*Id.* at 19].[14]

Ms. Abeyta is not incorrect that a bad faith claim may be viable even without coverage. As explained above, a bad faith claim can exist even without coverage if the claim "is based not on the denial of coverage, but on the defendant's alleged bad faith in the investigation, defense, handling, or settling of a claim." *Palm*, 2023 WL 2503511, at *5. But it is also "settled law in Colorado that a bad faith claim must fail if . . . coverage was properly denied and the plaintiff's only claimed damages flow[] from the denial of coverage." *MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1193 (10th Cir. 2009).

Insofar as Ms. Abeyta's bad faith claim is based on a failure to settle, the Court's finding of no coverage forecloses that portion of the claim. There is no duty to "settle claims or causes of action that fall outside policy coverage." 8 Colorado Practice, Personal Injury Torts & Insurance § 48:25 (3d ed. Nov. 2024 update); 14A Couch on Insurance § 203:26 ("An insurer's duty to settle is dependent upon whether the policy extends coverage for the circumstances underlying the harm sustained."); *Owners Ins. Co. v. Dockstader*, 861 F. App'x 210, 216 (10th Cir. 2021) (observing that "multiple

---

[14] To the extent Ms. Abeyta generally cites two expert reports that she says "document[] a litany of bad faith conduct on the part of Insurers," [Doc. 189 at 19]; *see also* [Doc. 189-1; Doc. 189-2], the Court does not address this argument. The Court already advised Ms. Abeyta that it viewed her attempts to incorporate other filings into her response brief as "an improper attempt to circumvent the Court's page limitations." [Doc. 174]. And it is not this Court's duty to read through the 38-page and 33-page expert reports in an attempt to find support for Ms. Abeyta's argument. *See Eateries, Inc. v. J.R. Simplot Co.*, 346 F.3d 1225, 1232 (10th Cir. 2003) (a court "need not sift through the record to find evidence to support a party's argument, nor manufacture a party's argument for [her]" (cleaned up)); *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1268 (10th Cir. 2008) (a court may decline to consider an argument that fails to provide specific citations in support).

authorities establish that an insurer has no duty to settle if no coverage exists" and citing

authority from numerous jurisdictions).   Ms. Abeyta's argument to the contrary is not

supported by any legal authority and is respectfully unpersuasive.  *See* [Doc. 189 at 19–

20].  Because there was no duty to settle, the Insurers could not have acted in bad faith

by declining to settle Ms. Abeyta's claim.  *See Lira v. Shelter Ins. Co.*, 913 P.2d 514, 517

(Colo. 1996) (finding that, where there was no contractual duty to indemnify the insured

for punitive damages, the insurer had no duty to settle with respect to punitive damages

and could not be held liable for excess judgment).

Ms. Abeyta also asserts that her bad faith claim is based on the Insurers' "faulty

investigation and erroneous determination that [Nicholas] Horton owned the motorcycle"

and the fact that "neither settlement opportunity was communicated to [Nicholas] Horton."

[Doc. 189 at 18–19].  However, "as with most tort claims, proof of actual damages is an

essential element of a bad faith breach of an insurance contract claim."  *Nunn v. Mid-

Century Ins. Co.*, 244 P.3d 116, 121 (Colo. 2010).  Here, it is undisputed that Ms. Abeyta

claims the following damages:  "the Excess on her assigned claim," which consists of "the

full amount of the principal and cost judgments (with post-judgment interest that were

entered against Horton which exceed the policy limits of both the [Policies]."  [Doc. 161

at ¶ 17; Doc. 189 at ¶ 17; Doc. 161-3 at 5, 8].  These damages still flow from the denial

of coverage, and Ms. Abeyta does not identify any actual damages that separately arise

out of either (1) the Insurers' investigation; or (2) the Insurers' alleged failure to

communicate two settlement offers to Mr. Horton.  *See* [Doc. 189 at 15–20]; *see also Pac.

Specialty Ins. Co. v. Poirier*, 408 F. Supp. 3d 1241, 1249 (D. Colo. 2019) (claimed

damages of excess judgment entered against insured flowed from denial of coverage).

Because all of Ms. Abeyta's claimed damages flow from the denial of coverage, summary judgment in Plaintiffs' favor is appropriate for this claim. *Pac. Specialty Ins. Co.*, 408 F. Supp. 3d at 1249; *5333 Mattress King LLC v. Hanover Ins. Co.*, 683 F. Supp. 3d 1188, 1200 (D. Colo. 2023) ("Because there is no coverage under the Policy for the damage to the Slab in this case, and because all of Mattress King's damages relate to the denial of coverage for the damage to the Slab, Hanover is entitled to summary judgment on each of Mattress King's claims."). Plaintiffs' Motion for Summary Judgment is respectfully **GRANTED** to the extent it seeks judgment on Ms. Abeyta's common law bad faith counterclaim.

## CONCLUSION

For the reasons set forth above, it is **ORDERED** that:

(1)  Plaintiffs/Counterclaim Defendants' Motion for Summary Judgment [Doc. 161] is **GRANTED**;

(2)  Defendant & Counterclaimant Nicholas Horton's Motion for Partial Summary Judgment [Doc. 131] is **DENIED**;

(3)  Plaintiffs/Counterclaim Defendants' Motion for Judgment on the Pleadings on their Declaratory Claim and Nicholas Horton's Counterclaims [Doc. 110] is **DENIED as moot**;

(4)  Judgment is **ENTERED** in Plaintiffs' favor on their declaratory judgment claim and Defendants' counterclaims;

(5)  Plaintiffs are awarded their costs under Rule 54 of the Federal Rules of Civil Procedure and Local Rule 54.1; and

(6)    The Clerk of Court is directed to close this case.


DATED:  February 25, 2025                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge